UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| J. C. T<small>AYLOR</small>, J<small>R</small>.,<br>    *Plaintiff*,<br><br>    *vs.*<br><br>M<small>ICHAEL</small> J. A<small>STRUE</small>, Commissioner of Social Security,<br>    *Defendant*. | )<br>)<br>)<br>)    1:12-cv-00831-JMS-TAB<br>)<br>)<br>)<br>) |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff J.C. Taylor, Jr. applied for Supplemental Security Income Benefits ("SSI") through the Social Security Administration ("SSA") in December 2010. [R. 37, 63-64; dkt. 12-2 at 38, 12.] After a series of administrative proceedings and appeals, including a hearing in October 2011 before Administrative Law Judge ("ALJ") Mark Ziercher, the Commissioner denied his application. [R. 6; dkt. 12-2 at 7.] The Appeals Council denied Mr. Taylor's timely request for review of the ALJ's decision, rendering that decision the final one for the purposes of judicial review. 20 C.F.R. § 404.981. Mr. Taylor then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the ALJ's denial.

### I.
#### B<small>ACKGROUND</small>

**A. Pertinent Medical Evidence**

Prior to the onset date of his alleged disability, Mr. Taylor initiated treatment for HIV with the LifeCare program at Methodist Hospital in Indianapolis, Indiana, on August 31, 2010. [R. 237-38; dkt. 12-7 at 6-7.] Nurse practitioner Barbara deRose examined Mr. Taylor. [*Id*.] Mr. Taylor reported to Nurse deRose that he was originally diagnosed with HIV in 2006, but he was not taking any medication for the illness. [R. 237; dkt. 12-7 at 6.] His energy level was lower than normal, he slept "a lot," and he had some night sweats. [*Id*.] However, Mr. Taylor

1

had not had any unusual weight loss, nausea, vomiting, or diarrhea. [*Id.*] Although he went to the emergency room for a cluster headache in May 2010, Mr. Taylor told Nurse deRose in August that he did not take the medication he was given and he was currently pain-free. [R. 237; dkt. 12-7 at 6.] Mr. Taylor also reported "occasional numbness" in his right arm from the elbow to the fingers. [*Id.*] Upon physical examination, Nurse deRose noted that Mr. Taylor's nose, sinus[es], and throat were normal, but thrush was present in his oral mucous membranes. [R. 237-39; dkt. 12-7 at 6-8.] Mr. Taylor's CD4 white blood cell level was less than 200, while the normal range is 500 to 1500. [R. 238; dkt. 12-7 at 7.] Mr. Taylor was started on Bactrin D5 daily for his HIV and Diflucan for the thrush. [*Id.*] On September 10, 2010, Mr. Taylor's Bactrin prescription was changed to Atripla. [R. 239; dkt. 12-7 at 8.]

On September 23, 2010, Mr. Taylor reported to Nurse deRose that he was not having any difficulty with his medications and was taking them as prescribed. [R. 240; dkt. 12-7 at 9.] He stated that his fatigue had reduced since his previous visit. [*Id.*] He also reported he was not suffering from any fevers, chills, night sweats, new muscle aches, joint pain, numbness, tingling, or weakness. [*Id.*] During her physical examination, Nurse deRose found that Mr. Taylor's thrush was improved, but he continued to have some coating on the back of his tongue and was prescribed Mycelex and "Mary's Magic Mouthwash." [*Id.*]

During a return visit on November 1, 2010, Mr. Taylor reported an increased energy level and weight gain of ten pounds. [R. 242; dkt. 12-7 at 11.] Again, Mr. Taylor reported that he was not suffering from any fevers, chills, night sweats, new muscle aches, joint pain, numbness, tingling, or weakness. [*Id.*] The thrush was also gone. [*Id.*] Mr. Taylor's CD4 count was 226/9% and his viral load was 519. [R. 244; dkt. 12-7 at 13.] On December 2, 2010, Mr. Taylor's CD4 count was 220/8% and his viral load was less than 48. [*Id.*]

In a disability report completed on December 7, 2010, Mr. Taylor indicated that he stayed tired "a lot" and his condition kept him homebound "a lot." [R. 158; dkt. 12-6 at 10.] However, when asked whether his HIV caused pain or other symptoms, he responded "No." [R. 154; dkt. 12-6 at 6.] When asked whether his condition caused him to make changes in his work activity, such as job duties, hours, or rate of pay, Mr. Taylor answered "No." [*Id.*]

H.R. Mathison, M.D., completed an Agency medical report on December 10, 2010, addressing Mr. Taylor's allegation of HIV infection. [R. 233-35; dkt. 12-7 at 2-4.] Dr. Mathison confirmed that Mr. Taylor was diagnosed with HIV, but he indicated that Mr. Taylor did not suffer from "Candidiasis involving the esophageous, trachea, bronchi, or lungs, or at a site other than the skin, urinary tract, intestinal tract, or oral or vulvovaginal mucous membranes." [R. 233; dkt. 12-7 at 2.] Dr. Mathison also specified that the only "repeated manifestation of HIV infection" exhibited by Mr. Taylor was one episode of thrush, which lasted approximately one month. [R. 235; dkt. 12-7 at 4.] Dr. Mathison did not indicate that Mr. Taylor had marked limitations in activities of daily living, social functioning, concentration, persistence, or pace. [R. 235; dkt. 12-7 at 4.]

On December 13, 2010, Mr. Taylor was counseled regarding the importance of taking his medications after he missed two doses. [R. 244; dkt. 12-7 at 13.] Regardless, Mr. Taylor reported that he did not have any unusual fatigue, chills, night sweats, upper respiratory issues, or gastrointestinal problems. [*Id.*] He denied muscle aches, joint pain, numbness, tingling, or weakness. [*Id.*] His mucous membranes were clear. [*Id.*]

William S. Sobat, M.D., performed a consultative physical examination on January 14, 2011. [R. 248-51; dkt. 12-7 at 17-20.] Mr. Taylor informed Dr. Sobat that he had episodes of nausea, anorexia, and fatigue before reestablishing medical care for his HIV in September 2010.

3

[R. 250; dkt. 12-7 at 19.]   Mr. Taylor reported, however, that he was seeing improvement with his medications, although he still had a problem with fatigue.  [*Id*.]  Mr. Taylor told Dr. Sobat that he had headaches about twice a month that lasted all day, had nausea daily, suffered from anxiety and depression "all the time," and suffered dyspnea after climbing a flight of stairs.  [*Id*.]  He admitted that he had not discussed his anxiety or depression with his physicians.  [*Id*.]  Upon examination, Dr. Sobat noted that Mr. Taylor was well-developed, well-nourished, and did "not appear acutely or chronically ill."  [*Id*.]  Dr. Sobat also indicated that Mr. Taylor appeared "very fit" and moved "about easily, he ha[d] no difficulty getting off the exam table or out of a chair."  [*Id*.]  Mr. Taylor had full range of motion in all joints and his gait was normal.  [R. 251; dkt. 12-7 at 20.]   Dr. Sobat noted that Mr. Taylor had some weakness in his legs and hand grip, but he rated Mr. Taylor's leg strength as 4/5 and his grip strength in both hands as 3/5.  [*Id*.]  He indicated that Mr. Taylor had normal strength in both arms, his gross and fine motor function of the hands was preserved, and his upper body and arms were "very muscular."  [*Id*.]

On January 19, 2011, Nicole Leisgang, Psy.D., performed a consultative psychological examination.  [R. 252-55; dkt. 12-7 at 21-24.]   Mr. Taylor complained that he was "occasionally anxious but depressed daily."  [R. 252; dkt. 12-7 at 21.]   He told Dr. Leisgang that he had not worked steadily since 2006 because he "gave up on everything."  [*Id*.]   With regard to Mr. Taylor's social functioning, Dr. Leisgang noted that Mr. Taylor indicated he had friends but did not see them regularly.  [R. 254; dkt. 12-7 at 23.]   He did see family.  [*Id*.]  He left his home three times in the previous two weeks.  [*Id*.]  Dr. Leisgang diagnosed Mr. Taylor with adjustment disorder with mixed anxious and depressed mood and assigned a GAF score of 60, indicating "moderate symptomatology."  [R. 255; dkt. 12-7 at 24.]

Mr. Taylor's sister, Mary Jo Scott, completed an Agency Function Report on January 25, 2011. [R. 167-74; dkt. 12-6 at 19-26.] Mr. Taylor lived with his sister during the time in question. [R. 167; dkt. 12-6 at 19.] Ms. Scott indicated that Mr. Taylor did not have any problems with personal care, he helped with housework, and he sometimes went to church. [R. 168-71; dkt. 12-6 at 20-23.] She reported that Mr. Taylor watched television every day, and there was no change in this activity since his condition began. [R. 171; dkt. 12-6 at 23.] Ms. Scott also indicated that Mr. Taylor had no problems getting along with family, friends, or neighbors, and there were no changes in his social activities since his illness or condition began. [R. 172; dkt. 12-6 at 24.] She further opined that Mr. Taylor got along with authority figures "OK." [R. 173; dkt. 12-6 at 25.]

State agency, non-examining consultant J. Sands, M.D. reviewed the evidence in the record and completed a physical residual functional capacity assessment on January 31, 2011. [R. 257-64; dkt. 12-7 at 26.] He concluded that Mr. Taylor could frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds. [R. 258; dkt. 12-7 at 27.] He determined that Mr. Taylor could stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. [*Id*.] Dr. Sands did not place any limitations on environment or Mr. Taylor's ability to push or pull, climb, balance, stoop, kneel, crouch, crawl, or manipulate. [R. 258-261; dkt. 12-7 at 27-30.] He limited Mr. Taylor to occasional balancing. [R. 259; dkt. 12-7 at 28.] M. Ruiz, M.D., reviewed all of the evidence in the file on May 2, 2011, and affirmed Dr. Sands' assessment. [R. 288; dkt. 12-7 at 57.]

State agency, non-examining consultant J. Gange, Ph.D., completed a mental residual functional capacity assessment on February 2, 2011, after reviewing the evidence in the record. [R. 265-281; dkt. 12-7 at 34-50.] Dr. Gange determined that Mr. Taylor was not significantly

limited in understanding and memory, in sustained concentration and persistence, and in most areas of social interaction and adaptation. [R. 265-66; dkt. 12-7 at 34-35.]  He determined that Mr. Taylor had moderate limitations in the ability to interact with the general public, set realistic goals, and make plans independently of others. [R. 266; dkt. 12-7 at 35.]  He concluded:

> The medical evidence suggests the claimant is able to understand, remember, and carry out semi-skilled tasks.  The claimant can relate on at [] least a superficial basis with co-workers and supervisors.  The cl[ai]mant can [] attend to a task for sufficient periods of time to complete tasks.  The claimant can manage the stresses involved with work.

F. Kladder, Ph.D., reviewed the evidence in the file on May 4, 2011, and affirmed Dr. Gange's assessment. [R. 289; dkt. 12-7 at 58.]

In April 2011, testing showed that Mr. Taylor had an undetectable viral load. [R. 286; dkt. 12-7 at 55.]  He did not report any new health issues. [*Id*.]  He denied unusual fatigue, fever, chills, night sweats, upper respiratory issues, or gastrointestinal problems. [*Id*.]  He did not report any muscle aches, joint pain, numbness, tingling, or weakness. [*Id*.]

On August 31, 2011, Mr. Taylor again denied muscle aches, joint pain, numbness, tingling, or weakness. [R. 301; dkt. 12-7 at 70.]  He said his energy level was good. [*Id*.]  He continued to report that he was not having fevers, chills, night sweats, upper respiratory or gastrointestinal problems. [*Id*.]  Nurse deRose indicated that Mr. Taylor's pain index was "0," and his HIV was "well controlled on Atripla with undetectable viral load." [*Id*.]  Despite this favorable examination, Nurse deRose indicated in an accompanying physical capacities evaluation that Mr. Taylor could sit for two hours total in an entire eight-hour work day, and stand and walk, in combination, for only one hour total. [R. 300; dkt. 12-7 at 69.]  Nurse deRose also wrote that Mr. Taylor could lift or carry twenty-six to fifty pounds occasionally, eleven to twenty-five pounds frequently, and up to ten pounds continuously. [*Id*.]  She determined that Mr. Taylor could not perform fine manipulation, grasp or push and pull arm

controls with his right hand, or use his right foot for repetitive movements such as pushing and pulling leg controls. [*Id.*] Nurse deRose also indicated that Mr. Taylor could not be exposed to unprotected heights, dust, fumes, gases or driving automotive equipment. [*Id.*] She concluded that Mr. Taylor could occasionally squat, climb, stoop, kneel, and crouch; and frequently bend, crawl, reach, and balance. [*Id.*] She did not include any remarks or explanations for these findings. [*Id.*]

### B. Summary of Testimony

Mr. Taylor was forty-four years old on the date of the ALJ's decision. [R. 23, 33; dkt. 12-2 at 24, 34.] He has a ninth grade education. [R. 33, dkt. 12-2 at 34.] He testified at his administrative hearing on October 19, 2011, that he last worked as a cook in 2006. [R. 37-38; dkt. 12-2 at 38-39.] Mr. Taylor testified that since he was diagnosed with HIV, his energy changed, he slept a lot, and his eyes were not the same. [R. 40-41; dkt. 12-2 at 42-43.] He indicated that when he worked around heat in the kitchen as a cook, he became "hot real quick" and short of breath. [R. 39; dkt. 12-2 at 40.] He indicated that he could walk a block or two before resting, but changed his testimony when questioned by his attorney to say that he could walk only half of a block or one block. [R. 53; dkt. 12-2 at 54.] He testified that he was not limited in how long he could sit. [R. 42; dkt. 12-2 at 43.] Mr. Taylor told the ALJ his medications caused him to sleep, and made it difficult for him to wake up when he did sleep. [*Id.*] He further indicated that he had some pain in his left wrist and was depressed. [R. 43; dkt. 12-2 at 44.] He testified that he continued to have headaches two to three times a month, which lasted for about an hour. [R. 47-48; dkt. 12-2 at 48-49.] When asked about what he does during the day, Mr. Taylor told the ALJ that he watched television for eight hours, might help with washing dishes, went shopping occasionally, and attended church "every now and then." [R. 49,

51-52; dkt. 12-2 at 50, 52-53.] He testified that while he stayed home because he did not "care to really go nowhere," he was not fearful to leave the house. [R. 54-55; dkt. 12-2 at 55-56.]

### C. ALJ Determination

The ALJ found that Mr. Taylor had not engaged in substantial gainful activity since November 23, 2010, the date of his application for SSI. [R. 11; dkt. 12-2 at 12.] He determined that Mr. Taylor had the severe impairments of HIV and adjustment disorder. [*Id.*] The ALJ found that Mr. Taylor did not have an impairment or combination of impairments that met or medically equaled any of the impairments in the Listing of Impairments ("Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 12-14; dkt. 12-2 at 13-15.] The ALJ also determined that Mr. Taylor's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. [R. 19; dkt. 12-2 at 20.] The ALJ further found that Mr. Taylor had the residual functional capacity ("RFC") to do medium work, except that he could only stand and/or walk for up to thirty minutes uninterrupted for up to a total of six hours in an eight-hour workday, and could sit for up to one hour uninterrupted for up to a total of six hours in an eight-hour workday. [R. 14; dkt. 12-2 at 15.] He noted that Mr. Taylor could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl, and he could have frequent exposure to extreme heat and interaction with co-workers, but he could have only occasional contact with the general public. [*Id.*] The ALJ also limited Mr. Taylor to productive work tasks for up to an average of ninety-six to one hundred percent of an eight-hour workday, not including typical breaks, and work that required no more than frequent independent goal setting or independent planning. [*Id.*] Using the testimony of a vocational expert ("VE"), the ALJ found that, given this RFC, Mr. Taylor could perform other jobs that existed in significant numbers in the national economy. [R. 21-22;

dkt. 12-2 at 22-23.]   The ALJ concluded, therefore, that Mr. Taylor was not disabled under the Act since November 23, 2010, the date he applied for SSI.  [R. 22; dkt. 12-2 at 23.]

## II.
### DISCUSSION

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the Commissioner's) findings.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted).  Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).  If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  Otherwise, the Court must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits.  *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> To evaluate a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can [he] perform [his] past relevant work, and (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).  After Step Three, but before Step Four, the ALJ must determine a claimant's RFC, which represents the claimant's physical and mental abilities considering all of the claimant's impairments.  The ALJ uses the

9

RFC at Step Four to determine whether the claimant can perform his own past relevant work and, if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 416.920(e).

Here, Mr. Taylor claims the ALJ committed various errors at Steps Three and Five. [*See* dkt. 16.] Specifically, Mr. Taylor raises the following four issues: (1) whether the ALJ's Step Three finding regarding disability and equivalence is supported by substantial evidence, [*id.* at 12]; (2) whether the ALJ needed to call an infectious disease expert to testify at Mr. Taylor's hearing, [*id.* at 20]; (3) whether the ALJ erred in assessing Mr. Taylor's credibility, [*id.* at 22]; and (4) whether the ALJ gave appropriate weight to Nurse deRose's functional evaluation when questioning the VE, [*id*. at 24]. The Court will consider each challenge in turn.[1]

### 1. The ALJ's Determination that Mr. Taylor's Condition Did Not Meet or Medically Equal Listing 14.08

Mr. Taylor first argues that the ALJ's determination that his impairments did not meet or medically equal Listing 14.08 was not supported by substantial evidence. [Dkt. 16 at 12.] Repetitively beginning a series of paragraphs with the phrase "The ALJ only selectively considered…," he argues that the ALJ "substitute[ed] his erroneous opinion for the opinions of the claimant's treating and examining physicians." [*Id.*] The Court disagrees.

A review of the ALJ's explanation of his decision shows that the ALJ considered the record as a whole, and that his decision is supported by substantial evidence in the record. Within his decision, the ALJ explicitly refers to the various medical and nonmedical evidence he

---

[1] In response to Mr. Taylor's initial brief, the Commissioner accurately points out that the latter two of Mr. Taylor's challenges are underdeveloped, lacking citation to evidence in the record or applicable law. Although these arguments may rightly be deemed waived, *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."), because the Court prefers to decide issues on the merits, it will nevertheless address all four of Mr. Taylor's challenges.

considered in making his finding that Mr. Taylor's impairments did not meet or medically equal Listing 14.08, which would require both "repeated manifestations of HIV infection . . . resulting in significant, documented symptoms or signs," and "marked limitation in social functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.08K.  While the ALJ acknowledged the evidence indicating possible manifestations of Mr. Taylor's HIV infection and his apparent difficulty in interacting with the general public, [R. 266, dkt. 12-7 at 35], he also considered that Mr. Taylor used public transportation, did not need to be accompanied on outings, shopped on his own, and attended church services, and that not only was the record devoid of any evidence that he had a marked limitation in social functioning, but his sister testified that there had been no change in Mr. Taylor's social activities since the onset of his illness.  [R. 35, 51-52, 171-172, 188-189; dkts. 12-2 at 52-53; 12-6 at 23-24; 40-41.]    Because the ALJ's decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Barnett*, 381 F.3d at 668, the Court finds that there is substantial evidence to support the ALJ's finding and preclude remand.  42 U.S.C. § 405(g).

The Court also agrees with the Commissioner that Mr. Taylor's argument, and the summaries of the relevant listing on which he relies, also fail because the summaries omit a critical portion of the regulation itself.  Because Listing 14.08B2 requires "Candidiasis involving the esophagus, trachea, bronchi, or lungs, or at a site other than the skin, urinary tract, intestinal tract, or oral and vulvovaginal mucuous membranes," and Mr. Taylor's candidiasis existed only in his mouth, it cannot qualify as evidence that he meets that listing.  [R. 237, 240, 242, 244, 286, 301; dkt. 12-7 at 6, 9, 11, 13, 55, 70 (medical evidence that Mr. Taylor's candidiasis was limited to mouth membranes).  *See also* R. 233, 235, dkt. 12-7 1 at 2, 4 (Dr. Mathison's confirmation that Mr. Taylor's candidiasis did not involve any qualifying sites under Listing 14.08B2.]

11

Furthermore, the Court finds that the ALJ's decision that Mr. Taylor did not meet Listing 14.08K is also supported by substantial evidence. Listing 14.08K requires "repeated manifestations of HIV infection," and defines "repeated" as "occur[ring] on an average of three times a year, or one every 4 months, each lasting 2 weeks or more, or [if not] for 2 weeks, [then] substantially more frequently than three times in a year or once every 4 months; or [occurring] less frequently than an average of three times a year or once every 4 months but last[ing] substantially longer than 2 weeks." While Mr. Taylor points to his complaints of headaches, night sweats, and nausea as manifestations of his HIV, as the Commissioner correctly points out, Mr. Taylor's complaint of muscle weakness on January 14, 2011, [R. 251; dkt. 12-7 at 18], is the only manifestation of the type included section K, and nothing in the record evidences that the manifestation was "repeated" as defined above. Rather, the record shows that Mr. Taylor consistently reported no muscle weakness. [R. 237, 239, 240, 242, 244, 286, 301; dkt. 12-7 at 6, 8, 9, 11, 13, 55, 70.]

The Court's review is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's findings, *Barnett*, 381 F.3d at 668, which it does here. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) ("The ALJ need only build a bridge from the evidence to his conclusion." (citations and internal quotation omitted)); *Glenn v. Secretary of Health & Human Services*, 814 F.2d 387, 391 (7th Cir. 1987) ("[C]ourts will rarely be able to say that the administrative law judge's finding was not supported by substantial evidence."). There is substantial evidence in the record to support the ALJ's finding and preclude remand, 42 U.S.C. § 405(g), and to the extent that Mr. Taylor attempts to highlight evidence that would support an alternate decision, his argument is unavailing. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992) ("The court should not supplant the agency's findings

merely by identifying alternative findings that could be supported by substantial evidence."). *See also Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. (2004) ("[T]he ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence." (internal citation omitted)). Accordingly, the Court will not remand the matter on that ground.

### 2. The ALJ's Consultation of an Expert's Opinion Regarding Medical Equivalency

Mr. Taylor also contends that the ALJ's findings at Step Three constitute error. Specifically, Mr. Taylor argues that the ALJ inadequately analyzed his condition because he should have consulted an additional medical expert ("ME") at the hearing to determine whether Mr. Taylor's combined impairments were of listings-level severity, and he improperly weighed medical opinion evidence. [Dkt. 16 at 20.] In response, the Commissioner argues that the ALJ's findings were supported by substantial evidence in the record, that ME testimony was unnecessary given the "ample evidence" already in the record, and that the ALJ gave proper weight to the various medical personnel who assessed or treated Mr. Taylor following his trauma. [Dkt. 20 at 20-21.] The Court agrees.

An ALJ must consider an expert's opinion regarding medical equivalency. *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."). "However, when the medical evidence in the record is sufficient to make a decision, the ALJ may rely on it alone." *Dye v. Astrue*, 1:11-cv-000402-TWP-TAB, 2012 WL 4514108, *9 (S.D. Ind. 2012) (citing *Similia v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)).

Here, the ALJ found that the medical evidence and opinions already in the record were sufficient for him to make his decision. The ALJ expressly considered the opinions of Dr.

Kladder, who reviewed and affirmed Dr. Gange's assessment, [R. 289, dkt. 12-7 at 58], as well as the Agency Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection completed by Dr. Mathison, who specifically addressed medical equivalency to Listing 14.08. [R. 16-17, 20; dkt. 12-2 at 17-18, 21.] While Mr. Taylor argues that the ALJ should have consulted an additional expert on infectious diseases to testify at his hearing, he cites no authority to support that proposition. [*See* dkt. 16 at 20.] Neither does he allege that the medical experts whose opinions the ALJ did consult were in any way unqualified to opine as to Mr. Taylor's HIV-related impairments. His argument is limited to the unsupported assertion that the ALJ "relied on his own layman's opinions." [*Id.*] As described above, it is undisputed that the ALJ consulted medical expert opinions, as was required of him, *Barnett*, 381 F.3d at 670, and therefore the Court will not remand this matter on that ground.

### 3. The ALJ's Credibility Determination Regarding Mr. Taylor's Testimony

Mr. Taylor also contends that the ALJ's credibility determination is erroneous. Specifically, Mr. Taylor claims that the ALJ "failed to make any accurate findings concerning the seven factors" and that "[c]ontrary to SSR 96-7p's assumption that the ALJ will fairly, completely and accurately report the evidence, this ALJ repeatedly mischaracterized the evidence to minimize the severity of the claimant's mental and physical impairments." [Dkt. 16 at 22.]

Under Social Security Ruling 96-7p, when assessing the credibility of a claimant's allegations regarding functional limitations caused by pain or other symptoms, an ALJ must consider the entire case record, including objective medical evidence, the individual's own statements, medical source opinions, and the following factors:

1. the individual's daily activities;

2. the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. factors that precipitate and aggravate the symptoms;
4. the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. any other factors concerning the individuals' functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (outlining the credibility analysis). While the ALJ is not required to address every factor or every piece of evidence in his decision, he must support his credibility finding with substantial evidence, and he is required to "explain h[is] decision in such a way that allows [the Court] to determine whether []he reached h[is] decision in a rational manner, logically based on h[is] specific findings and the evidence in the record." *Prochaska*, 454 F.3d at 738. As stated earlier, this Court's review of credibility findings is a limited one. Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft*, 539 F.3d at 678, the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska*, 454 F.3d at 738 (quotations omitted).

Here, the ALJ noted Mr. Taylor's testimony that he could not work because HIV lowered his energy levels, changed his vision, and prevented him from moving around "as quickly as he did in the past." [R. 16, 36; dkt. 12-2 at 17, 37.] The ALJ also noted the ways in which his testimony changed after prompting from his attorney (e.g. testifying that he did not have panic attacks, and then testifying that he had panic attacks on a regular basis). [R. 55; dkt. 12-2 at 56.] Furthermore, the ALJ's overall assessment of Mr. Taylor's credibility was not patently wrong in

light of the other substantial evidence supporting his adverse credibility finding. Specifically, the ALJ cites to several pieces of evidence to support his finding and consideration of the applicable 96-7p factors, including evidence that Mr. Taylor's claims about the location, duration, and intensity of his pain were not as limiting as he alleged. [R. 16; dkt. 12-2 at 17.] The ALJ also noted that there was no apparent evidence of factors that precipitate or aggravate his symptoms, and that he had received no other treatment besides medication. [R. 19; dkt. 12-2 at 20.] Although Mr. Taylor vaguely argues that the ALJ "failed to make any accurate findings concerning the seven factors," he does not support his argument with citation to the record, and his argument is therefore unavailing in light of this Court's limited standard of review.

As discussed above, substantial evidence supports the ALJ's adverse credibility finding, and the Court cannot find the ALJ's assessment to be "patently wrong," as is required for a reversal, *Prochaska*, 454 F.3d at 738. *See also Kittelson v. Astrue*, No. 09-2281, 2010 WL 271726, *4 ("The ALJ's adverse credibility finding was not perfect. But it was also not 'patently wrong.'") (internal citation omitted). Mr. Taylor's challenges on these grounds are therefore without merit.

### 4. The Weight the ALJ Assigned to Nurse deRose's Opinions

Mr. Taylor also challenges the weight the ALJ assigned to Nurse deRose's physical capacities evaluation. Specifically, he contends that the ALJ omitted "all of the limitations" of that report in his RFC assessment, and his questioning of the VE based on that assessment was therefore flawed.

As the Commissioner correctly points out, Nurse deRose does not qualify as either an "acceptable medical source" under 20 C.F.R. § § 416.913(a), or a "treating source" under 20 C.F.R. § § 416.902, but rather as an "other source." See C.F.R. § § 416.913(d) (defining "other

source"). While an ALJ may accept evidence from "other sources" regarding the severity of a claimant's impairments, the ALJ must consider the following factors when deciding what weight to give such an opinion:

- how long the source has known and how frequently the source has seen the individual;
- how consistent the opinion is with other evidence;
- the degree to which the source presents relevant evidence to support an opinion;
- how well the source explains the opinion;
- whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- any other factors that tend to support or refute the opinion.

SSR 06-03p.

Here, the ALJ considered that Nurse deRose's assessment was "summarily presented and provide[d] no insight as to how she came to her conclusions," and gave her opinion little weight as a result. He noted that her past examinations of Mr. Taylor failed to support her assertions in the physical capacity evaluation, [R. 17-18; dkt. 12-2 at 18-19], and that her opinions that he could only sit for two hours and stand/walk in combination for one hour during an entire eight-hour workday, [R. 300; dkt. 12-7 at 69], were in apparent contradiction to her notes of the same day which stated that Mr. Taylor had no pain, had good energy levels, and experienced no problems with his cardiovascular or neurological systems. [R. 301; dkt. 12-7 at 70.]

Because the ALJ's reasoning as to the weight he ascribed to Nurse deRose's opinions is supported by substantial evidence, the Court will not remand on that challenge. *See Sullivan v. Astrue*, 825 F.Supp.2d 928, 940 (N.D. Ill. 2011) (affirming an ALJ's determination that an "other source" opinion was entitled to "very little weight" because it did "not contain objective or clinical findings" to support it).

### III.
#### CONCLUSION

The standard for disability claims under the Social Security Act is stringent. "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 274 (7th Cir. 2010). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. *Id.* Taken together, the Court can find no legal basis for overturning the ALJ's determination that he does not qualify for disability benefits. Final judgment will issue accordingly.

04/02/2013

*[signature]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com